# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | |
|---|---|
| CLAUDE M. MUMPOWER, III,      ) | |
|     Plaintiff,      ) | |
|              ) | **MEMORANDUM** |
| v.      ) | **OPINION** |
|              ) | |
| CITY OF BRISTOL, VIRGINIA,      ) | Case No. 1:13cv00074 |
|     Defendant.      ) | |
|              ) | By: Pamela Meade Sargent |
|              ) | United States Magistrate Judge |

This matter is before the undersigned on the Defendant's Motion For Summary Judgment, (Docket Item No. 39), ("Motion"). The plaintiff has filed a response, and the defendant has filed a reply to the Motion, which is now ripe for disposition. The Motion was heard before the undersigned on June 27, 2014. A jury trial in this matter is scheduled for July 8-10, 2014, before the undersigned. The action, including the Motion, is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1). Based on the arguments and representations presented, and for the reasons stated in this Memorandum Opinion, the Motion will be granted.

## I. Facts[1]

The plaintiff, Claude M. Mumpower, III, ("Mumpower"), by Second Amended Complaint filed March 25, 2014, (Docket Item No. 30), sues the City of

---

[1] For purposes of the disposition of this Motion, the facts as set forth herein are construed in the light most favorable to the plaintiff, the nonmoving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

Bristol, Virginia, ("City"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et* seq., alleging that he was discriminated against in his employment as a Bristol, Virginia, Police Officer based on his sex. Mumpower alleges that he had worked as a Police Officer for the City since November 2006. He alleges that he was terminated from his job on or about April 17, 2012, while on light-duty work due to a job injury. The Second Amended Complaint states that Mumpower was "advised by management that he has missed too much work and could not continue to work on light-duty."

The Second Amended Complaint alleges that Mumpower was, and at all times had been, satisfactorily performing his job. It also alleges that Mumpower was absent from work eight to nine weeks during the previous 12-month period due to an on-the-job injury and gallbladder surgery. The Second Amended Complaint alleges that a female employee of the City and two female Police Officers were permitted to be absent from work for medical reasons for longer periods or were given light-duty work for longer periods than Mumpower without being terminated. Mumpower alleges that he received disparate treatment by the City as a result of his sex. He further alleges that the City's discriminatory actions were intentional and deliberate.

Attached to Mumpower's original Complaint, is a Notice of Right to Sue issued by the Equal Employment Opportunity Commission on June 24, 2013. (Docket Item No. 1-2). The court's docket shows that Mumpower's original Complaint was filed with the court on September 24, 2013. (Docket Item No. 1).

In support of its Motion, the City has provided the court with Mumpower's deposition testimony, deposition testimony from Fran Eric Turner, a former Senior

Sergeant with the Bristol, Virginia, Police Department, ("BVPD"), affidavit testimony from various other current and former City employees and its Answers to the Plaintiff's First Set Of Interrogatories And Requests For Production Of Documents, ("Answers to Interrogatories").

As stated above, Mumpower was employed by the City as a Patrol Officer from November 2006 through April 17, 2012, at which time he was on light-duty status due to a right knee injury incurred during a training exercise on June 21, 2010.  (Docket Item No. 40-1, ("Mumpower Depo."), at 18-19, 79.)  He was on medical leave from June 21, 2010, through September 1, 2010, but returned to work without restrictions on September 2, 2010.  (Docket Item No. 40-5, ("Price Affidavit"), at 2.)  Mumpower was off work again from October 10, 2010, to October 13, 2010, due to knee problems, and on October 30, 2010, and October 31, 2010, he called in sick.  (Price Aff. At 2.)  Thereafter, Mumpower was injured in an altercation and took several days of medical leave to recover.  (Mumpower Depo. at 20, 49; Price Aff. at 2.)  He underwent surgery on his right knee on June 13, 2011, and was out of work for 49 days, returning to light-duty work on August 1, 2011, and continuing to work in that capacity through October 13, 2011.  (Mumpower Depo. at 19, 48; Price Aff. at 2.)  Mumpower eventually resigned from his duties as a K-9 Officer by letter dated September 11, 2011, because he could not perform the running required by the job.  (Mumpower Depo. at 25-26.)  His treating physician, Dr. Testerman, released him to return to work without restrictions on or about October 14, 2011.  (Mumpower Deposition at 19-20, 48; Price Aff. at 2.)  Mumpower, however, was able to perform his job duties without restrictions for only about one month before having to return to light-duty status.  (Mumpower Depo. at 19-20, 48.)  At the time of his deposition in March 2014, Mumpower testified that his knee was "bone-on-bone," and that it was "totally

collapsed." (Mumpower Depo. at 6.)

In addition to his knee injury, Mumpower also was off of work for about four weeks during 2011 for gallbladder surgery. (Mumpower Depo. at 59-60; Price Aff. at 3.) While such a surgery normally would require only two weeks off work, it took Mumpower longer to heal because his stomach muscles are "pretty thick." (Mumpower Depo. at 60.) However, he admitted that the surgery was performed laparoscopically, and he suffered no complications. (Mumpower Depo. at 60.) William H. Price, former Chief of Police for the City, has submitted an affidavit on behalf of the City. He stated that Mumpower had used all paid and personal leave time at the time of his gallbladder surgery, and 30 hours of donated leave was approved. (Price Aff. at 3.)

By letter dated December 16, 2011, Dr. Testerman restricted Mumpower from running, stooping, bending, lifting, climbing or prolonged riding or driving in a car until further notice. (Price Aff. at 3.) Likewise, by letter dated December 19, 2011, Dr. Testerman's office requested that Mumpower be given a desk job because he was no longer fit to run, squat, lift, drive, climb or even ride in his patrol car because it did not allow him to stretch his right knee appropriately. (Price Aff. at 3.)

Mumpower's 2011 year-end employee performance review reflected that Mumpower's attendance and punctuality were rated as "1," the lowest possible score according to Chief Price, because he did not work most of the year. (Price Aff. at 3.) Regarding his physical conditioning, the review reflected that Mumpower had been deemed by medical doctors to be unfit to be an officer.

(Price Aff. at 3.)[2]

By letter dated March 23, 2012, Chief Price advised Mumpower that the City could no longer accommodate him in a light-duty position and that the BVPD needed him to return to his normal job duties as a Patrol Officer, as the City was short-handed in meeting the law enforcement needs of the community. (Ex. 2 to Mumpower Depo.; Price Aff. at 3-4). Mumpower further was advised that, if he was unable to return to his Patrol Officer's position by April 16, 2012, his employment with the City would be terminated on that date. (Ex. 2 to Mumpower Depo.; Price Aff. at 4). As of April 17, 2012, Mumpower had been on light-duty work for about one year. (Mumpower Depo. at 23.)

By letter dated April 17, 2012, Chief Price informed Mumpower that, because he had not responded to the March 23, 2012, letter, and had not reported to regular work duties by April 16, 2012, he was terminated from his employment with the City. (Price Aff. at 4.) According to Chief Price, the required duties of a Police Officer include the ability to perform physical actions that both Mumpower and his physician stated he could not perform, and Mumpower was terminated due to his inability to perform the required duties of a Patrol Officer, not because of his sex. (Price Aff. at 4.) Chief Price denied giving favorable treatment to female

_____

[2] The 2011 year-end employee performance review is attached as an exhibit to Price's Affidavit. (Docket Item No. 40-5, Ex. 25.) The review, however, does not contain any explanation of the scores given. Plaintiff's counsel argued at the June 27 hearing that the review showed that Mumpower was an "average" employee. The court gave plaintiff's counsel leave to file any evidence produced in discovery that explained the scale or scoring used on this review. Plaintiff's counsel has informed the court that she does not have any such evidence.

Insofar as plaintiff's counsel has tendered other employee performance reviews as evidence of the plaintiff's performance at the time of his termination, the court will not accept this evidence for two reasons. First, the record has closed for the purpose of submitting evidence in response to the Motion, and, second, the evidence tendered is not competent in that it is not accompanied by an affidavit from a person with knowledge authenticating the documents.

officers because of their sex, and he denied discriminating against male officers because of their sex. (Price Aff. at 4.)

Chief Price testified that Mumpower's extended periods of light-duty work and frequent absences created a significant hardship on the other Police Officers who had to cover for him and raised public safety concerns, as it resulted in one less officer available for emergency calls and to patrol the streets. (Price Aff. at 4.) Fran Eric Turner, a retired Senior Sergeant with the BVPD, and Clay Robinette, a former supervisor of Mumpower, have provided sworn testimony on behalf of the City. (Docket Item No. 40-7, ("Turner Depo."); Docket Item No. 45-6, ("Robinette Aff.")). They, likewise, testified that when an officer takes light duty or sick leave for an extended amount of time, it creates a hardship for other officers, who lose vacation time, must cancel plans or who are prevented from attending training, which places more stress on the officers and hurts morale. (Turner Depo. at 48-49; Robinette Aff. at 1-2.) They stated that it also may create individual officer safety concerns because it can impact the ability to respond to calls in a timely manner or to have sufficient back-up. (Turner Depo. at 48-49; Robinette Aff. at 2.) Robinette testified that Mumpower's shift often operated with one less officer than needed. (Robinette Aff. at 1.)

According to Mumpower, Chief Price told him several times while he was on light duty that he was going to be placed in the Criminal Investigations Division, ("CID"), in some capacity, and that he was going to "take care of him." (Mumpower Depo. at 9, 11, 16, 42, 56.) However, Robin McCoy, a female, was given the position, although Mumpower did not know why. (Mumpower Depo. at 42.) McCoy, a Detective with the BVPD since January 9, 2012, and a Master Officer before that, has provided an affidavit on behalf of the City. (Docket Item

No. 45-3, ("McCoy Aff.")).  The only time during her 13 years of employment with the City that McCoy worked light duty was following abdominal surgery on December 6, 2011, after which she worked light duty from December 12, 2011, through January 2, 2012, a period of less than three weeks.  (McCoy Aff. at 1.)  The City has provided medical records to substantiate this allegation.  (Docket Item No. 45-1, Ex. G).  Furthermore, the City stated that McCoy was given the CID job over three other candidates, including Mumpower, because she was able to answer questions regarding criminal investigations and had shown initiative by investigating several cases on her own as an officer, instead of referring them to the CID.  (Docket Item No. 45-1, ("Answers to Interrogs."), at 7-8.)  Mumpower could not name any cases he had worked to completion.  (Answers to Interrogs. at 8.)  The City's decision to appoint McCoy to the Detective position was entirely unrelated to her gender and was based solely on her initiative and experience.  (Answers to Interrogs. at 8.)

Mumpower admitted he could no longer perform the duties of a Police Officer, but he believed he could have performed the duties of a "CID position, a Gang Intel Position."  (Mumpower Depo. at 44.)  He maintained there was an available CID position, as well as a Gang Intel, ("GI"), position, at the time of his termination.  (Mumpower Depo. at 47.)  Mumpower applied for a Detective position in the CID in August 2010, but, according to Chief Price, this was not a light-duty position, as it carries the same physical requirements as the Patrol Officer position Mumpower held at that time.  (Price Aff. at 2.)  The City has provided a March 1, 2012, letter from Chief Price, which states he had conversations with Mumpower on that day and on February 29, 2012, in which Mumpower advised that he could not return to his position as a Patrol Officer.  (Docket Item No. 40-5 at 32).  Price further stated in this letter that he advised

Mumpower that all Police Officer positions, including CID, fell under the same job description, and that he could not create a new position for him. (Docket Item No. 40-5 at 32).

According to Mumpower, Vicki Byrd, who could perform only light-duty work due to multiple sclerosis, ("MS"), was given a light-duty position in gang intelligence, ("GI"), until her retirement. (Mumpower Depo. at 39-40.) He did not know when she got this position, when she retired or whether she retired because of her health condition. (Mumpower Depo. at 40.) The City has provided an affidavit from Trish Henderson, Director of Human Resources for the City. (Docket Item No. 40-2, ("Henderson Aff.")). Henderson stated that Byrd's personnel file contains no request for light duty related to any medical condition or disability, and when questioned, Mumpower admitted that he had seen no paperwork to confirm that Byrd was on light duty while working GI. (Henderson Aff. at 2; Mumpower Depo. at 40, 55.) The GI position was a grant-funded position existing from 1995 through 1998, long before Byrd's retirement in 2010. (Henderson Aff. at 3.) This position was not filled following Byrd's retirement because there was no longer any grant funding available for it, and it was no longer needed. (Henderson Aff. at 3.) Instead, when the grant funding for the GI position ended, Byrd became a Detective in the CID. (Henderson Aff. at 3.) Henderson stated that, although Byrd continued to perform some gang intelligence duties, she also performed numerous other duties and was a sworn officer. (Henderson Aff. at 3.) Henderson stated that Byrd's CID position was not a light-duty position, as it had many of the same duties as a Patrol Officer and required a certain level of physical fitness. (Henderson Aff. at 3.) Mumpower admitted that he did not know whether Byrd had to perform the same physical requirements as other officers in her position. (Mumpower Depo. at 41.)

The City also has provided an affidavit from Patricia Eller, a Sergeant in the Patrol Division since July 2010, who previously worked with Byrd. (Docket Item No. 40-6, ("Eller Aff."), at 1). Eller testified that when she worked with Byrd, Byrd gathered information on gang activity via Patrol Officers, School Resource Officers and CID Officers. (Eller Aff. at 1.) Byrd also interviewed gang members, documented gang-related graffiti, gathered information from indictments for the drug officers and attended drug association meetings. (Eller Aff. at 1-2.) According to Eller, Byrd's position was not light-duty because she went on drug buys and participated in drug roundups of gang members, which is quite physical. (Eller Aff. at 2.) Eller testified that all BVPD officer positions require a certain level of physical fitness and mobility. (Eller Aff. at 2.) She further testified that there are no permanent light duty officer positions available, and Byrd was not replaced when she retired. (Eller Aff. at 2.)

The City also has provided the affidavit of Sean Carrigan, a Major with the BVPD. (Docket Item No. 40-4, ("Carrigan Aff.")). Carrigan testified that the GI position was not created as an accommodation for Byrd, but was created because there was a need for it at the time. (Carrigan Aff. at 1.) When Byrd retired, she was not replaced because the position was no longer needed, and there was no longer grant funding for it. (Carrigan Aff. at 2.) Carrigan testified that Byrd was a sworn police officer and never requested a light-duty position. (Carrigan Aff. at 2.) He stated that Byrd developed her medical condition long after she was appointed to the GI position. (Carrigan Aff. at 2.) The City also provided an affidavit from Timothy Sexton, a former supervisor of Mumpower's. (Docket Item No. 40-3, ("Sexton Aff.")). He stated that Byrd suffered from MS, but her position in GI was not light-duty, noting that she went on drug buys, accompanied the SWAT team and carried a weapon. (Sexton Aff. at 2.) Sexton stated that Byrd

regularly performed police actions, something that an officer on light duty cannot do.  (Sexton Aff. at 2.)  He testified that he is unaware of any BVPD officer ever on light duty as long as or longer than Mumpower.  (Sexton Aff. at 2.)  Turner also testified that Byrd drove the SWAT team van for a while and conducted surveillance.  (Turner Depo. at 34.)

According to the City, Byrd never requested light duty and never worked in a light-duty position.  (Answers to Interrogs. at 11.)  The City further states that the GI position was not a light-duty position, although no separate job description for it exists.  (Answers to Interrogs. at 13-14.)  The City has provided a job description for a Police Detective, however, which states that it is "heavy work."  (Docket Item No. 45-1, Ex. B, ("Detective Description"), at 28.)

In support of his claim, Mumpower has provided an affidavit from DeeDra Branson, a former BVPD employee.  (Docket Item No. 41-1, ("Branson Aff.")).  Branson was hired as a Patrol Officer with the BVPD on September 11, 1995, and worked as a CID Detective from August 31, 1999, through April 4, 2014.  (Branson Aff. at 1.)  According to Branson, Byrd never performed any of the normal duties of a Police Officer, such as running, and she could not have performed them for at least the last several years she worked GI due to MS.  (Branson Aff. at 1-2.)  She testified that Byrd had trouble walking at times during her last couple of years at the BVPD, and she never was required to be able to perform the normal duties of a Police Officer.  (Branson Aff. at 2.)  She stated that the only other duty she was aware of that Byrd ever performed in her 18 years working GI was driving a SWAT team bus; this was her job when she "accompanied the SWAT team."  (Branson Aff. at 2.)  According to Branson, Byrd mostly worked at a desk, which Mumpower easily could have done.  (Branson Aff.

at 2.)  Branson testified that, whether or not the BVPD allowed Byrd to carry a gun at times does not, in practice, distinguish a light-duty position from a Patrol Officer position.  (Branson Aff. at 2.)  She stated that the BVPD had full knowledge that Byrd, at least for the last several years she worked as a GI officer, could never have performed the normal physical activities of an officer.  (Branson Aff. at 2.)  She further testified that, whether officially or not, Byrd's position in GI was a light-duty position.  (Branson Aff. at 2.)  Branson testified that the BVPD chose to keep Byrd in this GI position for 12 years after the grant funding for it allegedly ran out.  (Branson Aff. at 2-3.)

Mumpower testified that when he worked light duty, he mostly did lots of paperwork, but he also took all the walk-in reports, did all the warrant services that walked into the jail, did all the fingerprinting, ran errands, worked inmates in the garage and did some ride-alongs with some officers.  (Mumpower Depo. at 23.)  He stated that no one spoke with him regarding his termination being a result of his absences.  (Mumpower Depo. at 24.)

As stated above, Mumpower alleges that two female officers and a female employee of the City were treated more favorably than he was because they were allowed to be absent from work for medical reasons for longer periods or were given light-duty work for longer periods than he was without being terminated.  First, he testified that Colette Wilcox, an Assistant Commonwealth's Attorney for the City, was out of work for seven months during a one-year period due to pregnancy complications and that no disciplinary action was taken against her.  (Mumpower Depo. at 26-27.)  He stated that Wilcox was treated better than him because "[s]he was out all this time.  She had a lot of sick leave donated to her.  Then when she came back, she was allowed to work a couple hours a day and go

home.  They never … terminated her because she had an illness."  (Mumpower Depo. at 27.)  Mumpower admitted that Wilcox returned to work without any limitations.  (Mumpower Depo. at 28.)

Next, Mumpower testified that Robin McCoy, a Patrol Officer on his shift, was treated more favorably than he was.  (Mumpower Depo. at 29.)  He could not testify how long McCoy was on light duty, nor could he remember why McCoy was on light duty.  (Mumpower Depo. at 29.)  He testified that when McCoy returned to work from being on light duty, she began working in the CID.  (Mumpower Depo. at 30.)  Mumpower did not know whether McCoy had any restrictions on her ability to perform the duties of a Police Officer.  (Mumpower Depo. at 30.)  He also did not know what McCoy was doing on light duty.  (Mumpower Aff. at 30.)  McCoy stated in her affidavit that, while on light duty, she helped the records staff, handled walk-in visits from citizens and performed any other task she could find to do.  (McCoy Aff. at 1.)  In support of his claim that McCoy was treated more favorably, Mumpower testified that "[McCoy] was coming and going.  I was treated different than her.  Basically I even had to, it come to the point where I had to write on the wall when I would go to the bathroom and when I'd come back. ... We were totally treated different" by the shift supervisor, Patty Arthur.  (Mumpower Depo. at 30.)  Mumpower testified that his supervisor at that time, Lieutenant Helton, would even come into the bathroom and peek his head around the corner to check on him.  (Mumpower Depo. at 51.)  He also testified that McCoy would get to go home early at the end of the day when she was working light duty, but he could not, stating "[s]he got to do pretty much what she wanted to do."  (Mumpower Depo. at 35-36.)  Mumpower further testified that he did not know why he had to write his comings and goings on the wall.  (Mumpower Depo. at 32, 53.)  He testified that no one spoke with him

regarding the fact that they looked for him and could not find him. (Mumpower Depo. at 36.) He stated that his cell phone was always on, and he was either in the jail or in the police department unless he was at lunch, the chiropractor across the street for knee and back adjustments or at the police department's gym each morning to do rehab on his knee. (Mumpower Depo. at 36, 53-54.) Mumpower did not know of anyone else in the BVPD who had to sign in and out on the board. (Mumpower Depo. at 76.)

Eller testified that Mumpower was under her supervision for the last several months of his employment with the BVPD. (Eller Aff. at 2.) She stated that the duties Mumpower performed while on light duty were not sufficient to fulfill a full-time position. (Eller Aff. at 2.) According to Eller, when Mumpower was on light duty, he frequently could not be located during his shift, often leaving work without giving the officers notice of when and where he was going. (Eller Aff. at 2-3.) She testified that her lieutenant instructed her to know Mumpower's whereabouts at all times while working. (Eller Aff. at 3.) She stated that Mumpower did not have a portable radio while working light duty, so he was instructed to stay in the roll call room so dispatch could call him when necessary. (Eller Aff. at 3.) Robinette also testified that when Mumpower was on light duty, he often used the gym at the police station during his shift. (Robinette Aff. at 2.) The City stated that Mumpower frequently left the premises for long periods of time without telling his supervisors or dispatchers where he was. (Answers to Interrogs. at 17.) According to the City, all officers are required to inform dispatch of their whereabouts, which active officers typically do via portable radios. (Answers to Interrogs. at 17.) However, because Mumpower did not have a portable radio while on light duty, his supervisors used other means to track his whereabouts. (Answers to Interrogs. at 17.) Also, contrary to Mumpower's

contention, the City stated that all Detectives are required to record their whereabouts on a white board. (Answers to Interrogs. at 17.)

Next, Mumpower testified that he believes Jeanette Loudy was treated more favorably because the position of Domestic Violence, ("DV"), Officer was created for her, a pregnant female officer, but he could not remember who told him this. (Mumpower Depo. at 37-38.)  He also could not remember who created the position or when, and he admitted that he did not know whether the City has a policy of allowing female officers who are pregnant to work in this position. (Mumpower Depo. at 38.)  Mumpower also could not recall any other pregnant female officers who were allowed to work in this position while on light duty. (Mumpower Depo. at 39.)  Loudy is an officer and has been so employed since September 24, 1997.  (Answers to Interrogs. at 10.)  The City has provided a medical note from Dr. Wesley Harris, M.D., with Bristol Gynecology & Obstetrics, P.C., dated January 6, 1999, stating that Loudy was seven weeks pregnant at that time, with a due date of August 28, 1999.  (Docket Item No. 45-1, Ex. C).  Dr. Harris further stated that, due to the demands of the pregnancy, Loudy should be stationed at light duty, which he defined as the performance of clerical and administrative work, and he noted that Loudy should not be in uniform or on patrol duty.  Turner testified that Loudy was able to return to the position of Patrol Officer after working light duty in this DV position.  (Turner Depo. at 37-38.) Mumpower admitted that, generally, women have babies, but then recover to full strength at some point, further admitting that Loudy returned to normal duty, and she was working normal duty when he was terminated.  (Mumpower Depo. at 39, 63.)  He did not know how long women were allowed to remain in this DV Officer position, but he stated that some women "carried it for a while.  Some didn't." (Mumpower Depo. at 39.)

According to Branson, the DV position was initially created for Patty Eller after her second pregnancy, although when she returned from her pregnancy, she remained in that position. (Branson Aff. at 3.) Branson stated that it was a light-duty position, in which Eller never performed patrol duties. (Branson Aff. at 3.) She stated that, once in a while, Eller would perform extra duties like working Downtown Race Night, where the only activity was walking around. (Branson Aff. at 3.) She stated that Mumpower easily could have performed these duties. (Branson Aff. at 3.) Branson testified that she, personally, worked in the CID for 13 years and was never required to chase anyone, even as a Detective. (Branson Aff. at 3.) Branson testified that, as a Detective in the CID, the officer generally makes arrests with back-up and calls a Patrol Officer for transport to the jail. (Branson Aff. at 3.) She stated that Mumpower easily could have worked a CID job. (Branson Aff. at 3.) Branson testified that, although the BVPD claims the GI, DV and CID positions are not light-duty positions, each of these was given to a female, and in each, the female performed only light-duty work, i.e. no running and no working patrol. (Branson Aff. at 3.) She stated that the light-duty positions seemed to be reserved for female officers, and she did not know of any male officers who ever were allowed to work in these positions. (Branson Aff. at 3.) Branson testified that Byrd was allowed to retire from her position in GI. (Branson Aff. at 3.) She stated that Mumpower could have been assigned to this vacant position, and she understood that Chief Price had told Mumpower that he would put him in this position after Byrd's retirement. (Branson Aff. at 3.) However, he failed to do so, and Mumpower was terminated because he could work only in a light-duty position and, at least during Branson's tenure, only female officers were allowed to remain long-term in light-duty positions prior to her termination after Mumpower filed suit. (Branson Aff. at 3-4.)

Branson testified that Angie Simpson, a female Police Officer, was placed on light duty during a pregnancy, but after she returned to work, she was allowed to remain on light duty through the time when she again became pregnant. (Branson Aff. at 4.) Simpson was an officer employed by the City from September 11, 1995, through April 4, 2014. (Answers to Interrogs. at 10.) The City has provided two separate medical notes from two distinct time periods in which light-duty placement was recommended for Simpson. (Answers to Interrogs., Ex. F at 37-38.) First, on July 17, 2007, Dr. David Russell, M.D., with Bristol Gynecology & Obstetrics, P.C., noted that Simpson was 11 weeks pregnant and needed to be off of patrol and on light duty effective immediately. (Answers to Interrogs., Ex. F at 38.) The other note, also from Dr. Russell, is dated January 12, 2009, and states that Simpson needed to change to light duty as of January 26, 2009. (Answers to Interrogs., Ex. F at 37.) According to Branson, prior to Mumpower filing this lawsuit, no female had been terminated for remaining on light duty indefinitely. (Branson Aff. at 4.) However, after Mumpower filed suit, she needed to be placed on light duty, and she was terminated as the first female from the BVPD after her time on light duty ran out. (Branson Aff. at 4.) Branson testified that the only reason she was terminated was to make sure a female was terminated rather than remain long-term on light duty because of Mumpower's allegations that females in the BVPD who use up their time on light duty are not terminated. (Branson Aff. at 4.) She testified that Henderson pushed Tabitha Crowder, Interim City Manager, to make an example out of Branson as the first female terminated due to light-duty time running out, solely because of Mumpower's lawsuit. (Branson Aff. at 4.) To corroborate this allegation, Branson stated that Chief Price wanted to donate his accumulated sick leave hours to her prior to his retirement, something routinely permitted in the past. (Branson Aff. at 4.) However, per policy, the City Manager must approve donated hours over 165 hours. (Branson Aff. at 4.) To Branson's

knowledge, for the first time ever, Crowder refused to approve Chief Price's donation to Branson.  (Branson Aff. at 4-5.)  She stated that this was because it would have allowed her, as with all females before her, to continue to work on light duty, and it would have provided further evidence that Mumpower's allegations were true.  (Branson Aff. at 5.)

Branson stated that the BVPD always has shown deference to female employees, noting that female officers who formerly worked night shift and then take maternity leave are allowed to come back to work on day shift if they like, while men have no such options when returning from medical leave for any reason.  (Branson Aff. at 1.)  She stated that women were always given preferential treatment, prior to her case, particularly under Chief Price.  (Branson Aff. at 1.)

Mumpower testified that he thinks women are treated better, but he admitted that he did not know of any policy by the City to treat female officers better than male officers.  (Mumpower Depo. at 74.)  He simply stated "[I]t's always been that way there."  (Mumpower Depo. at 74.)  While he testified that some harassment was directed at him because he was injured, including the placement of notes making fun of his knee injury and placing donation boxes out for him, he did not allege any similar harassment based on his sex.  (Mumpower Depo. at 67, 76.)

Mumpower testified that Turner was on light duty for a long period of time due to injuries he sustained in a car accident while on duty and, like him, also was ultimately terminated.  (Mumpower Depo. at 79.)  Turner began working as a Police Officer in May 1998 and took medical retirement in 2011, effective in 2012.  (Turner Depo. at 5-6.)  Turner testified that he, personally, worked light duty on more than one occasion, the first time being in 2003 due to a back injury.  (Turner

Depo. at 7-8.) He was first denied light-duty status by Chief Price, but after questioning why he did not get it when other people had, his request was approved. (Turner Depo. at 8.) Turner did not remember how long he was on light duty on that occasion. (Turner Depo. at 8.) He testified that he was again placed on light duty in 2006 for a couple of weeks to a month, at most, due to a back injury, and in 2010 for a couple of weeks after a car accident at work. (Turner Depo. at 8-9.) He stated that there was not enough light-duty work to create a full-time permanent position. (Turner Depo. at 9.)

After receiving permanent work restrictions in February 2011 as a result of the 2010 car accident, Turner was told by Chief Price to "go home." (Turner Depo. at 10.) In fact, Chief Price told him to go home the very morning Turner received permanent restrictions. (Turner Depot. at 10.) Turner admitted that he never requested to remain on light duty, and the Chief told him "there's nothing here for you to do." (Turner Depo. at 12.) He testified that he could not do CID, GI or DV work because those are not light-duty positions, but "full-duty sworn officer positions" that carry the potential for making felony arrests. (Turner Depo. at 33-34.) Turner also testified that the DV Officer position was not always held by someone on light duty, but he noted that some individuals who did hold the position were pregnant. (Turner Depo. at 46.) Turner testified that people working light duty carried weapons. (Turner Depo. at 43.)

Turner admitted to having been the subject of an internal investigation for "conduct unbecoming," for which he was suspended for two weeks, but he did not think this had anything to do with his termination. (Turner Depo. at 25, 29.) He testified that he did not believe there was any ulterior motive for his termination other than the fact that he could no longer work. (Turner Depo. at 21.) He stated

that he knew his career was over after speaking with his doctor. (Turner Depo. at 21.)

Mumpower has submitted his own affidavit in support of his claim. (Docket Item No. 42, ("Mumpower Aff.")). He testified that, at the time of his termination from his position with the City, and through the current time, he was, and continues to be, able to perform each and every duty performed by employees in GI, DV and CID positions. (Mumpower Aff. at 1.)

Henderson testified that Mumpower was terminated because he and his physician indicated he was physically incapable of performing the required duties of his job. (Henderson Aff. at 1.) Turner testified that he did not witness any discrimination because of sex at the BVPD, nor did he believe that the City treated female employees more favorably. (Turner Depo. at 22-23.) He further testified that he never witnessed anyone discriminate against Mumpower for any reason, nor did he hear any rumors about Mumpower being treated poorly by other employees or supervisors. (Turner Depo. at 23-24.) Eller testified that the BVPD Patrol Division consists of far more male Patrol Officers than female Patrol Officers. (Eller Aff. at 3.) She also testified that she had not observed any hostility toward males at the BVPD, nor had she witnessed any instances when Mumpower was treated differently than any other officer because of his sex. (Eller Aff. at 3.) Likewise, Carrigan testified that he did not believe that Mumpower was treated any differently or unfairly or otherwise discriminated against because of his sex. (Carrigan Aff. at 1.) He stated that, to the best of his knowledge, no officer of either gender was permitted to work on light duty for as long as or longer than Mumpower. (Carrigan Aff. at 1.) According to Carrigan, the BVPD had terminated other employees, both male and female, who could not perform the required duties

of their jobs.  (Carrigan Aff. at 2.)  For example, Henderson stated that a female Communications Officer formerly employed by the BVPD was terminated under circumstances similar to Mumpower's, noting that she, too, was unable to perform her job duties due to a medical condition.  (Henderson Aff. at 3.)  Sexton also testified that he had never observed any hostility toward males in the BVPD, nor did he believe Mumpower was treated differently than any other officer because of his sex.  (Sexton Aff. at 2.)  Likewise, McCoy and Robinette testified that they had never observed any hostility toward males in the BVPD, nor did they believe Mumpower was treated differently than any other officer because of his sex. (McCoy Aff. at 3; Robinette Aff. at 3.)

## II. Analysis

With regard to a motion for summary judgment, the standard of review is well-settled.  The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587.  Thus, the court will view the facts and inferences in

the light most favorable to the plaintiff on the defendant's Motion. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996).

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (West 2012). Employment discrimination based on sex discrimination in violation of 42 U.S.C. § 2000e can be proven by direct or circumstantial evidence. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983). Direct evidence is "'conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Spain v. Va. Commonwealth Univ.*, 2009 WL 2461662, at *7 (E.D. Va. Aug. 11, 2009 (quoting *Rhodes v. FDIC*, 257 F.3d 373, 391-92) (4th Cir. 2001)). Absent direct evidence, the elements of a prima facie Title VII sex discrimination case are established through the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable

treatment.  *See Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012).

If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).  The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  If the employer articulates such a reason, the burden returns to the plaintiff to prove that the employer's stated reason was actually a pretext for discrimination.  *See McDonnell Douglas*, 411 U.S. at 804; *see also Bonds*, 629 F.3d at 386.

Here, Mumpower has advanced no direct evidence of sex discrimination. Thus, his claim must be analyzed using the burden-shifting scheme in *McDonnell Douglas*.  For the reasons that follow, I find that Mumpower fails to meet his burden of establishing a prima facie case of sex discrimination.

First, it is clear that Mumpower, as a male, is a member of a class protected under Title VII.  Second, however, I find that Mumpower has failed to produce acceptable evidence that he was performing his job satisfactorily at the time of his termination. Even viewing the facts and reasonable inferences to be drawn therefrom in the light most favorable to Mumpower, I find that reasonable jurors could not find that Mumpower was performing his job satisfactorily, whether it be his job as a Patrol Officer or the job he was performing while on light-duty status. Mumpower does not make any distinction, nor does he address these two jobs separately.  Instead, he simply argues that he was performing his job satisfactorily because he had never suffered a suspension or other disciplinary action prior to his termination.  The City does not dispute that this is the case.  However, this does not

end the inquiry. The appropriate test is whether Mumpower was meeting the legitimate expectations of his employer at the time of his termination. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Having never been suspended or otherwise disciplined does not necessarily lead to the conclusion that Mumpower was meeting the legitimate expectations of his employer. It also is important to note that "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *King*, 328 F.3d at 149 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (citations omitted)). It is important to note that the Fourth Circuit in *King* held that an employee's own testimony or a co-worker's fact testimony that he was performing his job satisfactorily at the time of termination is not sufficient to establish this prong of the prima facie case. *See* 328 F.3d at 149.

I find that there is no dispute in the evidence that Mumpower could not perform the job of a Patrol Officer as early as December 16, 2011, when Dr. Testerman advised the City as follows: "At this time [Mumpower] is still restricted to no running, stooping, bending, lifting, climbing, etc. due to continued effusion in his knee. He is also to refrain from prolonged riding or driving in a car. These restrictions will be in place until further notice." Likewise, in an Encounter Summary by Derek Rhoton, a Physician's Assistant for Dr. Testerman, dated December 19, 2011, Rhoton noted Dr. Testerman's treatment and findings, stating as follows: "We absolutely recommend a change in [Mumpower's] job description to basically a desk job. He is no longer safe to perform duties of running, climbing, squatting, lifting, or even riding in his patrol car as this does not allow him to stretch the right knee appropriately. Mr. Mumpower is aware of these statements as this was discussed in our office visit on 12/16/11."

The City has offered evidence of its legitimate expectations of Mumpower through the job description of a Police Officer, which includes, among other things, the ability to climb, stoop, kneel, crouch, reach, stand, walk, run, pull, lift, finger, grasp and feel. A Police Officer also must be able to drag a 150-pound bag of sand beyond five yards, sprinting distances of 25 yards, climbing over a five-foot wall and stepping one foot at a time, eight inches high. These are tasks that Mumpower clearly has been restricted from performing since at least December 16, 2011, three months prior to his termination. Additionally, the City has offered evidence of a 2011 year-end review of Mumpower, in which he received the lowest possible score for attendance and punctuality. This review also reflected that Mumpower's physician had deemed him unfit to be an officer. Moreover, Mumpower has admitted that he could no longer perform the duties of a Patrol Officer once his physician placed permanent restrictions on him. Furthermore, Robinette stated that, even before Mumpower's knee injury, his job performance was lacking in certain areas, including failure to perform required building checks and a lower than expected productivity in traffic violation citations. Additionally, although Mumpower testified he did not know why he had to post his comings and goings on a board for a period of time while on light duty, Eller testified that she had been instructed by her lieutenant to know Mumpower's whereabouts at all times because he frequently could not be located during his shift. She further stated that Mumpower often left work without giving the officers notice of when and where he was going. Robinette echoed Eller's statements, noting that, when Mumpower was on light duty, he often used the gym at the police station during his shift.

It is for all of these reasons that I find that Mumpower fails to raise a genuine issue of material fact with respect to whether he was meeting the City's

legitimate expectations at the time of his termination in March 2012. Assuming, *arguendo*, that Mumpower could meet this element of a prima facie Title VII sex discrimination case, I find that he has produced sufficient evidence to establish the other prongs of a prima facie case for reasons stated below.

Mumpower has shown that he suffered an adverse employment action when he was terminated from his employment effective April 17, 2012. Thus, I must determine whether Mumpower has produced evidence that similarly situated female employees were treated more favorably that Mumpower. First, I find that Colette Wilcox is not similarly situated because, as evidenced by Henderson's affidavit, personnel decisions regarding Wilcox were made by the elected Commonwealth's Attorney, while personnel decisions regarding Mumpower were made by Chief Price and the City Manager. *Runnebaum v. NationsBank of Md., N.A.*, 95 F.3d 1285, 1307 (4th Cir. 1996) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (holding that before employees can be viewed as comparable for purposes of invidious discrimination, they must have the same standards, same supervisors and engage in the same conduct)). Furthermore, according to Henderson, Wilcox was on medical leave for just over six months, before returning to work in a regular capacity. Mumpower admitted that Wilcox returned to work without any limitations. Thus, Wilcox, who had a different supervisor than Mumpower, was able to ultimately return to her regular duties after being on medical leave. For all of these reasons, I find that Mumpower fails to raise a genuine issue of material fact as to whether he and Wilcox are similarly situated.

Mumpower also points to Robin McCoy as a potential comparator. The evidence shows that McCoy was on light duty from December 12, 2011, through

January 2, 2012, a period of slightly more than two weeks, after undergoing abdominal surgery. I find that McCoy is not a suitable comparator because she worked light duty for only approximately two weeks, while Mumpower worked light duty well over a year. Additionally, McCoy was able to return to work without restrictions, while Mumpower was not. Therefore, Mumpower fails to raise a genuine issue of material fact as to whether he and McCoy are similarly situated. I also find that he fails to raise a genuine issue of material fact as to whether McCoy was treated more favorably because she is a female. Mumpower so alleges, noting that, while on light-duty status, he had to keep track of his comings and goings on a wall board, while McCoy did not. He alleges that he and McCoy were "totally treated different" by Patty Arthur, the shift supervisor. He also alleges that McCoy would get to go home early, while he did not. He stated that McCoy "got to do pretty much what she wanted to do." He stated that he did not know of anyone else in the BVPD who had to keep track of their whereabouts on the wall board. However, the City provided evidence that all Detectives are required to record their whereabouts on a white board. Furthermore, the City provided evidence from Mumpower's former supervisors that he frequently could not be located during his shift while working light duty, including Eller's testimony that he often left work without giving the officers notice of when and where he was going and Robinette's testimony that he often used the police station's gym while on duty. Eller stated that, for these reasons, her lieutenant had asked her to know Mumpower's whereabouts at all times while working.

Mumpower also alleges that Jeanette Loudy, who worked as a DV Officer while pregnant, was treated more favorably than him because that position was created for pregnant female officers. Again, however, I find that Mumpower fails to raise a genuine issue of material fact as to whether he and Loudy are similarly

situated. The City provided a note from Dr. Harris with Bristol Gynecology & Obstetrics, dated January 6, 1999, stating that Loudy was seven weeks pregnant at that time, with a due date of August 28, 1999. Due to the demands of the pregnancy, he recommended that Loudy work in a light-duty capacity, which he defined as the performance of clerical and administrative work. Again, unlike Mumpower, Loudy returned to the position of Patrol Officer after working light duty in the DV Officer position. Moreover, Mumpower admitted that, generally, women have babies, but then recover to full strength at some point, further admitting that Loudy ultimately returned to normal duty and was so working at the time he was terminated. Although Mumpower testified that he had been told that the DV Officer position was created for pregnant officers, he could not remember who told him this, nor could he recollect any other female officers who were allowed to work in this position while on light duty. I find that reasonable jurors could not find that Mumpower and Loudy are similarly situated because the evidence shows that Loudy was on light duty no longer than seven months, much less than Mumpower. Also, the evidence shows that Loudy ultimately returned to her full-duty position as an officer.

I further find that reasonable jurors could not find that Loudy was treated more favorably than Mumpower. Despite his contention that the DV Officer position was created for pregnant female officers, Mumpower could not remember who told him this, he admitted he did not know whether the City had a policy of allowing pregnant female officers to work in this position, he was unable to recollect any other pregnant female officers who held this position while on light duty, and he did not know how long women were allowed to remain in this position.

Lastly, Mumpower argues that Vicki Byrd was similarly situated to him and was treated more favorably. According to Mumpower, Byrd could perform only light-duty work due to MS. According to Mumpower, Byrd worked a light-duty GI position until her retirement. However, the City has offered evidence from its Human Resources Director that Byrd never requested light duty related to any medical condition and that the GI position was grant-funded and existed only from 1995 through 1998, after which time it was not filled. Thereafter, Byrd became a CID Detective, at which time she continued to perform some gang intelligence duties in addition to numerous other sworn officer duties. Henderson testified that this was not a light-duty job, and Byrd had many of the same duties of a Patrol Officer and required a certain level of physical fitness. Other officers echoed Henderson's testimony. For instance, Eller testified that Byrd's position was not light-duty, as she went on drug buys and participated in drug roundups of gang members, which is "quite physical." Major Carrigan also stated that Byrd was a sworn police officer and never requested a light-duty position, noting that Byrd developed MS long after she received the GI position. Sergeant Sexton, likewise, testified that the GI position was not light-duty work, noting that Byrd went on drug buys, accompanied the SWAT team and carried a weapon. He stated that Byrd regularly performed police actions, something that an officer on light duty cannot do. Turner also testified that Byrd drove the SWAT team van for a while and conducted surveillance. Mumpower admitted that he did not know whether Byrd had to perform the same physical requirements as other officers in her position. McCoy testified that Byrd did not receive any accommodations for her medical condition while she worked as a GI officer and that GI Detectives carried weapons and were subject to being called out on patrol, so such officer had to be physically able to perform all officer duties. Robinette testified that Byrd's CID position was not light-duty, and she was a fully capable functioning officer when

she was appointed to the position until she retired in 2010. Robinette stated that he is not aware of Byrd ever receiving any accommodations for a medical condition or requesting light duty.

The City also has provided the court with a job description for the Detective position in the CID. Pursuant to this job description, a Police Detective position is "heavy work," requiring the officer to drag a 150-pound bag of sand 100 feet, run a 90-yard dash and scale two five-foot walls. The officer also must be able to successfully complete the physical requirements of the police academy. Police Detective work requires climbing, stooping, kneeling, crouching, reaching, standing, walking, running, lifting, pulling, fingering, grasping and feeling. The officer must meet the physical criteria established by the Virginia Department of Criminal Justice. In its Answers to Interrogatories, the City states that there is not a separate job description for the GI position.

Mumpower has provided an affidavit from DeeDra Branson in support of his claim, specifically challenging the City's allegations that Byrd did not perform light-duty work. According to Branson, Byrd never performed any of the normal duties of a Police Officer like running, nor could she have done so for at least the last several years she worked due to MS. Branson testified that Byrd even had difficulty walking during her last couple of years with the BVPD. According to Branson, Byrd was never required to be able to perform the normal duties of a Patrol Officer, nor did she perform any extra duties such as walking around during Downtown Race Night. Instead, she mostly worked at a desk. According to Branson, it is true that Byrd accompanied the SWAT team, but all she did was drive the team bus. She stated that, whether or not an officer carries a gun, is not determinative of whether a job is light-duty or not.

Based on the above evidence, I find that Mumpower has raised a genuine issue of material fact as to whether he and Byrd are similarly situated and whether she received more favorable treatment due to her sex. More specifically, there is sworn testimony favorable to both parties regarding whether Byrd worked in a light-duty position while working the GI job, the CID job or both. There is testimony that Byrd worked in the GI position from at least 1995 through 1998, a total of three years. According to Branson, Byrd worked in the GI position until her retirement in 2010, a total of 15 years.[3] Either way, the time period is greater than that which Mumpower worked light duty. Assuming Byrd did leave the GI position after the funding allegedly ended in 1998, there is conflicting sworn testimony whether her job as a Detective with the CID was light-duty, whether officially classified as such or not. The City attempts to distinguish Byrd's situation from Mumpower's by showing that Byrd never formally requested light-duty status. I find, however, that if the evidence shows that Byrd, in fact, was performing in a light-duty capacity, it does not matter whether she formally requested to be placed on light-duty status. According to sworn affidavit testimony, she could have held the CID position for as long as 12 years, again, much longer than Mumpower worked light-duty status, without being terminated, but, instead being allowed to retire. For all of these reasons, I find that there is a genuine dispute of material fact regarding whether both Mumpower and Byrd worked on light-duty status for extended periods of time and, therefore, are similarly situated.

Additionally, I find that there is a genuine dispute of material fact as to whether Byrd was treated more favorably than Mumpower. More specifically, Byrd was allowed to retire after working in a light-duty capacity for an extended period of time, while Mumpower was terminated. Thus, I find that reasonable

---

[3] Branson testified that this totaled 18 years, but 1995 through 2010 would total 15 years.

jurors could find that Byrd received more favorable treatment than Mumpower based on her sex.

Thus, assuming Mumpower had produced competent evidence that he was satisfactorily performing his job duties at the time of termination, I find that he has otherwise produced sufficient evidence to establish a prima facie Title VII sex discrimination case. Next, the City must articulate a legitimate, nondiscriminatory reason for his termination. The City has met its burden of production by stating that Mumpower was no longer able to perform the duties of his job as a Patrol Officer, given the restrictions placed upon him by his treating physician, and its need for him to return to this position because it was short-handed in meeting the law enforcement needs of the community. Therefore, Mumpower must show that this stated legitimate, nondiscriminatory reason for his termination is merely pretext for discriminatory animus. This he cannot do.

First, Mumpower must show that the proffered reason for the adverse employment action is false and, second, he must establish that the alleged form of discrimination was the real reason. *See Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 525 (E.D. Va. 2013) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). At the pretext stage of an employment discrimination case, a plaintiff may not simply allege that the employer's stated reasons were inaccurate without also tethering, or enabling the court to tether, the employer's decision to discriminatory reasons. *See Ramos*, 963 F. Supp. 2d at 525. The plaintiff must first undercut or invalidate the employer's stated reasons and also establish through evidence or through inference that improper discriminatory motivation was the real reason. *See Ramos*, 963 F. Supp. 2d at 525. Here, Mumpower fails to provide any

such evidence.

Mumpower has produced no evidence that the City's stated reason for his termination is false. In fact, Mumpower concedes that he can no longer perform the job of a Patrol Officer. Thus, Mumpower has produced no evidence from which reasonable jurors could infer that the City's reasons for terminating him were mere pretext for sex discrimination. That being the case, I will grant the City's Motion for Summary Judgment on Mumpower's sex discrimination claim because, even if he could establish a prima facie case, Mumpower fails to raise a genuine issue of material fact as to whether the City's articulated legitimate, nondiscriminatory reason for termination is mere pretext for sex discrimination.

I further recommend that the court close this case and strike it from the docket.

ENTER: June 30, 2014.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE